**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HASAN HUTCHINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:05-CV-2091 CAS |
| v. | ) | |
| | ) | |
| DAIMLERCHRYSLER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant DaimlerChrysler Corporation's motion for summary judgment. Plaintiff Hasan Hutchinson opposes the motion. For the following reasons, the Court will grant defendant's motion for summary judgment on plaintiff's federal race discrimination claims and will dismiss the supplemental state law claims.

## I. **Background**.

Plaintiff, an African-American male, was formerly a production worker for defendant at its St. Louis Assembly Plant South in Fenton, Missouri (the "South Plant"). Plaintiff was discharged by defendant in November 2004 for the stated reason that plaintiff filed false claims for unemployment and other compensation for weeks he was actually working at defendant's South Plant. Plaintiff was reinstated to work in March 2005 through the grievance process collectively bargained between defendant and plaintiff's union. Several weeks later, plaintiff went on sick leave to seek psychological treatment. While on leave, plaintiff was referred to a psychiatrist by defendant's insurance carrier to determine whether he was ready to return to work. During the examination, plaintiff made statements that he wanted to kill the DaimlerChrysler supervisor who caused plaintiff's discharge, and that he would like to harm other specific DaimlerChrysler employees. Defendant was notified of plaintiff's

statements, took security measures in response, and ultimately terminated plaintiff's employment in June 2005.

Plaintiff filed this action alleging discriminatory discharge on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), and 42 U.S.C. § 1981. Plaintiff's discriminatory discharge claims are based on both the November 2004 discharge and the June 2005 discharge. Plaintiff also asserts state law claims of defamation and intentional and negligent infliction of emotional distress.

Defendant moves for summary judgment on the grounds that plaintiff cannot establish a prima facie case of race discrimination under either Title VII or § 1981, and that plaintiff's Title VII claims are procedurally barred because plaintiff (1) did not timely file an EEOC charge with respect to his first discharge; (2) did not file an EEOC charge alleging race discrimination with respect to his second discharge; and (3) failed to timely file this action within ninety days of receiving an EEOC right-to-sue notice. Defendant also moves for summary judgment on the state law claims, asserting that plaintiff cannot establish the elements of a prima facie case of defamation or negligent or intentional infliction of emotional distress.

## II. **Legal Standard**.

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly

establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

With this standard in mind, the Court accepts the following facts as true for purposes of resolving this motion for summary judgment.

## III. Facts.[1]

Defendant DaimlerChrysler operates two automotive assembly plants in Fenton, Missouri. Plaintiff was employed at one of the plants, the South Plant, beginning in 1994 as a temporary part-time employee. In 1995, plaintiff became a full-time employee and a member of the United Automobile, Aerospace and Agricultural Implement Workers of American ("UAW") and its Local Union No. 110. (Ex. 1 at 55:8-13). As a member of the UAW, the terms and conditions of plaintiff's employment with DaimlerChrysler are set by collective bargaining agreements between DaimlerChrysler and the UAW. (Ex. 1 at 31:13-22) (Ex. 2 at ¶ 7). UAW employees work on a seniority system, and plaintiff's seniority date was March 7, 1995. (Ex. 1 at 54:6-8, 55:8-10).

DaimlerChrysler has Standards of Conduct governing the conduct of all employees. (Ex. 3, Decl. of Angela Miller, at ¶ 4) (Ex. 3A, Standards of Conduct). Engaging in conduct that violates the Standards of Conduct is grounds for disciplinary action, up to and including suspension or discharge.

---

[1]Plaintiff admitted the majority of defendant's Statement of Uncontroverted Material Facts [Doc. 19] ("Def.'s SOF"): 1-28, 30-43, 49-50, 53-54, 57-58, 60-62, 72-106, 109, 114, 122-131, 133-137, 139-145, and 148-154. See Pl.'s Resp. to Def.'s SOF [Doc. 21]. Plaintiff did not respond to paragraph 29. For paragraphs 44-46, 63-71, 108, 110-113, and 115-121, plaintiff responds that he "has insufficient information to admit or deny said allegation[s]." See Pl.'s Resp. to Def.'s SOF. These paragraphs are deemed admitted. Rule 56(e) requires an opposing party to set forth specific facts through affidavits or other admissible evidence showing that there is a genuine issue for trial. Local Rule 4.01(E) requires an opposing party to set forth disputed facts with specific references to the record. All facts not specifically controverted by the opposing party are deemed admitted under Local Rule 4.01(E). See Deichmann v. Boeing Co., 36 F.Supp.2d 1166, 1168 (E.D. Mo. 1999); see also Reasonover v. St. Louis County, Mo., 447 F.3d 569, 579 (8th Cir. 2006). The "concision and specificity required" by local rules such as Local Rule 4.01(E) "seek to aid the district court in passing upon a motion for summary judgment, reflecting the aphorism that it is the parties who know the case better than the judge." Libel v. Adventure Lands of America, Inc., 482 F.3d 1028, 1032 (8th Cir. 2007) (citing Northwest Bank & Trust Co. v. First Ill. Nat'l Bank, 354 F.3d 721, 725 (8th Cir. 2003) and discussing Iowa Local Rule 56.1) (district court did not abuse its discretion in deeming defendant's statement of uncontroverted material facts admitted where plaintiff responded with "denied" without supporting citation). All facts that have either been admitted or deemed admitted are incorporated herein by this reference.

(Ex. 3 at ¶ 5) (Ex. 3A). It is a violation of the Standards of Conduct to provide false and/or misleading information to the Corporation. (Ex. 3A at No. 1).

It is a violation of the Standards of Conduct to threaten, intimidate, coerce, harass, retaliate or use abusive language to others. (Ex. 3A at No. 14). DaimlerChrysler has a workplace discrimination and harassment prevention policy ("Policy 3-6"). (Ex. 2 at ¶ 9) (Ex. 2B, DaimlerChrysler Corporation Policy 3-6). Under Policy 3-6:

> DaimlerChrysler's policy is to provide equal employment opportunity without regard to race, color, gender, sexual orientation, age, veteran status, marital status, religion, national origin, disability unrelated to the ability to perform a job, or any other basis protected by law. This applies to all aspects of employment, including hiring, job assignment, training, career development, promotion and compensation.

(Ex. 2B at D000004). Under Policy 3-6, "DaimlerChrysler does not tolerate harassment of any kind in the workplace." (Ex. 2B at D000004). Under Policy 3-6:

> Examples of conduct that may constitute harassment include unwelcome physical conduct; threats or intimidation; displaying offensive items or pictures; interfering with or sabotaging someone's work or personal or assigned property; and making jokes or inappropriate comments about a person's age, race, gender, religion, ethnicity, sexual orientation, marital status or disability. One act or a series of acts may constitute harassment.

(Ex. 2B at D000004). Employees who violate Policy 3-6 are subject to discipline, up to and including discharge. (Ex. 2B at D000005).

DaimlerChrysler has a workplace violence prevention policy ("Policy 3-7"). (Ex. 2 at ¶ 10) (Ex. 2C, DaimlerChrysler Policy 3-7). Under Policy 3-7, it is the policy of DaimlerChrysler to "promote a safe, non-violent work environment for its employees, vendors and visitors." (Ex. 2C at D000001). Under Policy 3-7, it is DaimlerChrysler's policy to "maintain a 'zero tolerance for violence' approach in dealing with those who violate [Policy 3-7]." (Ex. 2C at D000001).

Under Policy 3-7, it is DaimlerChrysler's policy to "assess disciplinary action up to and including dismissal against any employee found to have committed an act of violence." (Ex. 2C at D000002). Under Policy 3-7 an "**act of violence** is any behavior that is intended or likely to be perceived as intending to create a fear of bodily harm, actual physical injury, or damage to a corporate asset." (Ex. 2C at D000002) (emphasis in original). Under Policy 3-7:

> **Zero tolerance for violence** means that an act of violence shall be deemed unacceptable in any form. This conduct shall include, but not be limited to, the following acts: implied, verbal, or written threats, intimidation or physical assault. Those who engage in such behavior will be held accountable and dealt with in a manner consistent with maintaining a violence-free workplace. Alleged violations of this Policy will be reviewed on a case-by-case basis, taking into consideration all available facts and circumstances.

(Ex. 2C at D000002) (emphasis in original).

Under the Collective Bargaining Agreement ("CBA") between DaimlerChrysler and the UAW, upon discharge of an employee, plant management is to notify the employee and the Chief Steward or Plant Shop Committeeman in the district of the discharge and the reason therefore. (Ex. 1 at 110:17-111:7) (Ex. 3 at ¶ 10) (Ex. 3B, excerpt from CBA, at D001428-D001429). Under the CBA, there is a grievance procedure whereby employee grievances are presented to DaimlerChrysler by the UAW for resolution. (Ex. 2A, excerpt from CBA, at D001416-D001427).

Under the CBA, employees with at least one year of seniority who are on a "qualifying layoff" may be eligible to receive benefits under the Supplemental Unemployment Benefit Plan ("SUB-pay"). (Ex. 1 at 115:9-117:19) (Ex. 5, Decl. of Jo Ann Hatfield, at ¶ 4) (Exhibit 5A, excerpt from CBA, at D000703). A "layoff" includes:

> [A]ny layoff resulting from a reduction in force or temporary layoff, or from the discontinuance of a Plant or operation, or a layoff occurring or continuing because the Employee was unable to do the work offered by the Corporation although able to perform other work in the Plant to which he would have been entitled if he had

sufficient Seniority, or a layoff occurring or continuing because the Employee, although not totally disabled was physically unable to perform any work in his Bargaining Unit or Plant.

(Ex. 5A at D000706).

When an employee is on a layoff, he or she is still employed by DaimlerChrysler. (Ex. 1 at 106:5-10). The SUB-pay benefit payable to an eligible employee for any week is an amount which, when added to the employee's state benefit (i.e., unemployment compensation) or other compensation received, will equal approximately 95% of an employee's weekly after-tax pay, minus $30.00 to take into account work-related expenses not incurred during layoff. (Ex. 1 at 115:9-117:19) (Ex. 5 at ¶ 5) (Ex. 5A at D000711).

In practice, the SUB-pay system works as follows: A seniority employee claims unemployment compensation with the State, which is an automated system, for the week in which the employee was on layoff; the State electronically transmits DaimlerChrysler a weekly register of all employees who have received unemployment compensation for the week; the electronic register is entered into DaimlerChrysler's computer system and a SUB-pay report is generated; and if the employee is on a qualifying layoff, he or she will automatically receive SUB-pay for the week claimed. (Ex. 5 at ¶ 6). If an employee is not on a qualifying layoff, he or she will automatically be denied SUB-pay. (Ex. 5 at ¶ 7).

Jo Ann Hatfield, Employee Program Specialist, is responsible for monitoring all unemployment compensation and SUB-pay claims throughout DaimlerChrysler. (Ex. 5 at ¶ 3). Ms. Hatfield is responsible for auditing SUB-pay reports to determine whether individuals received unemployment compensation for weeks that they were not on a qualifying layoff. (Ex. 5 at ¶ 8). When Ms. Hatfield audits the SUB-pay reports, she does not have any identifying information about an employee other

than his or her social security number. She does not know the employee's race or gender. (Ex. 5 at ¶ 9).

Plaintiff applied for unemployment compensation benefits with the Missouri Division of Employment Security (the "Division") for the weeks ending September 18, 2004, September 25, 2004, and October 2, 2004, although plaintiff was not on a qualifying layoff and was working in the South Plant during these three weeks. (Pl.'s Decl. at 1, ¶ 1) (Pl.'s Resp. to Def.'s Statement of Material Facts, ¶¶ 49-50, 53-54, s57-58) (Ex. 4, Decl. of Leon Boyce, at ¶ 5) (Ex. 4A, SUB-pay report) (Ex. 10, letter from Leon Boyce dated October 19, 2004). Plaintiff applied for unemployment benefits for these weeks because he had not received unemployment benefits for weeks ending August 21, 2004 and August 28, 2004. (Pl.'s Decl. at 1, ¶ 1)

During a review of the SUB-pay report, it was discovered that plaintiff and several other employees had claimed and received unemployment compensation for weeks they were not on a qualifying layoff and were actually in the South Plant working. (Ex. 4 at ¶ 4) (Ex. 5 at ¶ 6).

Leon Boyce, DaimlerChrysler's Employment Supervisor, monitored SUB-pay reports at the South Plant as it has traditionally been the job of the Employment Supervisor to protest illegitimate unemployment compensation claims with the Division. (Ex. 4 at ¶¶ 2-3). By letter dated October 19, 2004, Mr. Boyce notified the Division that plaintiff had applied for and received unemployment benefits for the weeks ending September 18, September 25, and October 2, 2004, although plaintiff was in the South Plant and working those weeks. (Ex. 10). Mr. Boyce requested that the Division disqualify plaintiff from receipt of those benefits and relieve DaimlerChrysler's rating account of any charges. (Ex. 10).

DaimlerChrysler considers claims for unemployment compensation for weeks in which an employee is working as providing false information to the corporation. (Ex. 5 at ¶ 10). The State reports DaimlerChrysler's unemployment rate based upon the number of unemployment compensation claims it receives against DaimlerChrysler. DaimlerChrysler is required to report its unemployment statistics to the State based upon its employee layoffs. Therefore, if an employee is claiming unemployment compensation when actually working, the unemployment rate reported by DaimlerChrysler appears lower than the State's rate. (Ex. 5 at ¶ 10). When the State transmits the unemployment compensation claim data to the corporation, it is all automated, and the incorrect unemployment data is automatically logged into DaimlerChrysler's computer system. (Ex. 5 at ¶ 10). The amount of unemployment compensation tax that DaimlerChrysler pays to the State is tied to the number of unemployment compensation claims made against the corporation. (Ex. 5 at ¶ 10). Because providing false and misleading information to the corporation is a violation of the Standards of Conduct, the proper response of the local Plant management is to terminate the employee for violation of the Standards of Conduct. (Ex. 5 at ¶ 11).

Leon Boyce reported to Kyle Rudling, Human Resources Manager at the South Plant, that plaintiff was claiming unemployment compensation for weeks he was working in the South Plant. (Ex. 4 at ¶¶ 2 & 14) (Ex. 6, Decl. of Kyle Rudling, at ¶¶ 2-3). Mr. Rudling contacted Jeff Lofay, from Corporate Union Relations at the corporate headquarters, about this unemployment compensation issue. (Ex. 6 at ¶ 4). In speaking with Mr. Lofay, Mr. Rudling learned that there were a number of individuals across the corporation who were claiming unemployment compensation while working during this time period. (Ex. 6 at ¶ 4). An audit was conducted at the corporate level, and the

corporate office determined these individuals, including plaintiff, should be terminated. (Ex. 5 at ¶ 11) (Ex. 6 at ¶ 4).

On November 11, 2004, Angela Miller, Labor Relations Representative at the South Plant, notified plaintiff that he was being immediately discharged due to a violation of the Standards of Conduct by providing false and/or misleading information to the corporation. (Ex. 1 at 68:16-19 & 151:24-157:15) (Ex. 3 at ¶¶ 2 & 7) (Ex. 3C, Supervisor's Report) (Ex. 4F at D000007).

Lee Lansdon was present during the termination as plaintiff's UAW representative. (Ex. 1 at 151:24-154:19) (Ex. 3 ¶ 11). Consistent with DaimlerChrysler's obligations under the CBA, Ms. Miller provided plaintiff with written notification of his discharge and Mr. Lansdon was also provided notice. Mr. Lansdon signed the notice to acknowledge receipt on behalf of the UAW. (Ex. 3 at ¶ 11) (Ex. 3C).

Plaintiff admits receiving a total of five weeks of unemployment compensation benefits from the Division of Employment Security, although he was eligible to receive only two weeks of such benefits. (Pl.'s Decl. at 1, ¶ 3). Plaintiff had repaid the excess payments to the State of Missouri before his employment was terminated. (Id., ¶ 4). Shortly before plaintiff's employment was terminated, he received a letter from the Division which stated that he had repaid the excess unemployment compensation benefits. (Id., ¶5). Plaintiff gave the letter to Derrick Bennett, his UAW Chief Steward, and believes that Mr. Bennett "brought the letter to Leon Boyce." (Id. at 2, ¶ 7).[2]

---

[2]Plaintiff contends in his opposition to the motion for summary judgment that DaimlerChrysler only became aware that plaintiff had received excess unemployment benefits shortly before the November 2004 termination, when Mr. Boyce received the letter sent to plaintiff by the Division, which plaintiff gave to Chief Steward Bennett to give to Mr. Boyce. This contention is controverted by plaintiff's admission that Mr. Boyce wrote a letter to the Division dated October 19, 2004, notifying the Division that plaintiff had applied for and received unemployment benefits for weeks that plaintiff was working, and asking it to disqualify plaintiff from receipt of those benefits. (Pl.'s Resp.

Plaintiff subsequently filed a claim for unemployment compensation with the Division. (Compl. at ¶ 14) (Ex. 4 at ¶ 16). Leon Boyce, on behalf of DaimlerChrysler, protested plaintiff's unemployment compensation claim. (Pl.'s Compl. at ¶ 15) (Ex. 4 at ¶ 16).

On November 15, 2004, the UAW filed a grievance claiming that plaintiff's termination was an unjust discharge. (Ex. 2 at ¶ 11) (Ex. 2D, UAW Grievance). The UAW requested that plaintiff be reinstated and made whole. (Ex. 2D). Through the grievance process, at the Plant level, plaintiff was reinstated on March 19, 2005. (Ex. 1 at 68:20-24) (Ex. 2 at ¶ 12) (Ex. 4F at D000007). Plaintiff was reinstated without back-pay. (Ex. 1 at 182:20-184:23) (Ex. 2 at ¶ 12).

The UAW's grievance was allowed to continue for purposes of obtaining plaintiff's back-pay. (Ex. 2 at ¶ 12). The grievance was withdrawn without prejudice by the UAW on August 22, 2006, although plaintiff was never informed that the grievance had been withdrawn, and instead was told that the grievance was combined with a grievance arising from his second discharge. (Ex. 2 at ¶ 12) (Pl.'s Decl. at 3, ¶ 20).

When plaintiff returned to work in March 2005, he had animosity towards Leon Boyce and Karen Boeckstiegel,[3] who he blamed for his discharge, to the point that he was having feelings of doing bodily harm to Mr. Boyce. (Ex. 1 at 196:20-198:4). Plaintiff went to his Employee Assistance Programs ("EAP") representative and told him that he was having thoughts of doing bodily harm to

to Def.'s Statement of Material Facts, ¶¶ 61-62). Thus, the record shows that defendant knew of plaintiff's acts in seeking unwarranted unemployment benefits well before it also received this information from plaintiff. Moreover, even if plaintiff's contention were accepted as true, it would not raise an issue of fact sufficient to preclude summary judgment.

[3]Ms. Boeckstiegel is the Labor Relations Supervisor at the South Plant. (Ex. 2 at ¶ 2).

Mr. Boyce. (Ex. 1 at 197:22-24). The EAP program is in place for employees to get help with personal, family, or chemical dependency problems. (Ex. 1 at 198:6-15).

Plaintiff's EAP representative suggested that plaintiff check himself into CenterPointe Hospital before he did anything that he would regret. (Ex. 1 at 25:7-16 & 197:22-198:4). On April 1, 2005, plaintiff went on sick leave and checked into CenterPointe Hospital. (Ex. 1 at 68:25-69:8 & 192:10-12) (Ex. 2 at ¶ 13) (Ex. 4F at D000007).

Under the CBA, seniority employees are entitled to sick leave. (Ex. 2A at D001465). Under the CBA, DaimlerChrysler is required to maintain group sickness and accident insurance coverage, which provides the sick leave benefit to eligible employees. (Ex. 2A at D001049-D001053). In order to qualify for sickness and accident benefits, the employee is required to submit written notice of his claim to the insurance company. (Ex. 2A at D001052-D001053). Under the CBA, there is a Disability Evaluation Program ("DEP") designed to provide independent disability evaluations in disputed sickness and accident benefit cases. (Ex. 2A at D001196-D001199). The DEP examination report is to indicate whether an employee is "able to work," "not able to work," or "able to work with restrictions." (Ex. 2A at D001198).

Plaintiff was referred for a DEP examination by DaimlerChrysler's insurance carrier, ESIS. (Ex. 2 at ¶ 13) (Ex. 8, letter dated July 6, 2005 from Pl., at D000040). On April 22, 2005, plaintiff saw a psychiatrist, Fred W. Gaskin, M.D., for a DEP examination. (Ex. 7, Pl.'s South Plant Medical Records, at D002401). Plaintiff was made aware that he was seeing Dr. Gaskin for an independent disability evaluation and that what he disclosed was not confidential. (Ex. 7 at D002401). Plaintiff was also made aware that he was not seeing Dr. Gaskin for medical care and a physician-patient relationship was not established. (Ex. 7 at D002401).

During the DEP examination, plaintiff stated, "I still want to murder Leon Boyce, that's the guy who had me terminated for no f…ing reason." (Ex. 7 at D002401). Plaintiff also stated, "Karen Boeckstiegel, her fat ass, head of HR, that's going to happen." (Ex. 7 at D002401). Dr. Gaskin concluded that plaintiff was not able to return at the time of the evaluation and recommended re-evaluation for a couple of weeks later. (Ex. 7 at D002402).

On May 13, 2005, plaintiff again saw Dr. Gaskin for a DEP examination. (Ex. 7 at D002404) (Ex. 8 at D000040). Again, plaintiff was made aware that he was seeing Dr. Gaskin for an independent disability evaluation, that what he disclosed was not confidential, and that the physician-patient relationship was not established. (Ex. 7 at D002404).

During the DEP examination, plaintiff revealed that his thoughts of harming others included "putting a bullet [in] Leon Boyce's head and if I can find Karen Boeckstiegel, Don Pizzo got it coming, but the only person I want is Leon Boyce." (Ex. 7 at D002405). When asked if he thought that he could return to work at DaimlerChrysler with those thoughts, plaintiff stated, "I can't wait to go back to work, I want to see them bitches." (Ex. 7 at D002405). When asked about the possibility of not being able to return to work at DaimlerChrysler, plaintiff stated, "I can find another job, Leon Boyce has got to die." (Ex. 7 at D002405). Dr. Gaskin told plaintiff that he had a duty to notify the three people he mentioned of the death threats, and plaintiff responded, "You gotta do what you gotta do." (Ex. 7 at D002405).

Plaintiff admitted in his deposition testimony that he told Dr. Gaskin that he "wished that Leon Boyce and Karen Boeckstiegel could basically feel the pain that I was, you know, going through, and that I did have thoughts of straight hurting them, both of them. All three of them, her and Don Pizzo really." (Ex. 1 at 202:11-25). Plaintiff admitted in his deposition testimony that his expression of

wanting to hurt those individuals probably included wanting to kill them, although he did not recall his statements "word for word." (Ex. 1 at 203:1-4) (Ex. 8 at D000040-D000041).

Dr. Gaskin called the South Plant and left messages with Karen Boeckstiegel, Leon Boyce, and Don Pizzo to call him as soon as possible. (Ex. 7 at D002405). Dr. Gaskin also called the Security Office at the South Plant and reported the threats to Mark McColgan, Site Security Manager. (Ex. 2E, Security Information Reporting System, at D002371) (Ex. 7 at D002405-D002406).

Security notified Leon Boyce, Karen Boeckstiegel, and Don Pizzo about the threats made by Plaintiff. (Ex. 2E at D002371-D002372). Security also notified the Human Resources Manager, Kyle Rudling, and the Plant Manager, Jim Nihls, about the threats. (Ex. 2E at D002371-D002372) (Ex. 6 at ¶ 5). Plaintiff's employee badge was disabled and a stop order was posted so that plaintiff could not enter the South Plant, which is standard practice. (Ex. 2E at D002371) (Ex. 6 at ¶ 5). Security offered to give the threatened employees escorts to their vehicles, and advised them that they might want to change their parking habits for a while. (Ex. 2E at D002371). Security also reported the threats to the St. Louis County Police Department. (Ex. 2E at D002371) (Ex. 12, St. Louis County Police Report).

After Mr. Rudling was notified of the threats, he contacted the Disability Manager to obtain Dr. Gaskin's report. (Ex. 6 at ¶ 6). After reading the report, Mr. Rudling spoke with Jeff Lofay, from Corporate Union Relations, and Dominic Manzi, from Corporate Human Relations, about the situation. (Ex. 2 at ¶ 15) (Ex. 6 at ¶ 6). In January 2005, there had been a shooting by an employee at DaimlerChrysler's Toledo Plant. (Ex. 6 at ¶ 7). In light of the Toledo shooting, workplace violence was being taken very seriously by DaimlerChrysler at the time. (Ex. 6 at ¶ 7). Workplace violence was

even discussed at the annual meeting between management and the UAW in March 2005. (Ex. 6 at ¶ 7).

After discussing the issue with Mr. Lofay and Mr. Manzi, Mr. Rudling and Ms. Boeckstiegel, with concurrence of Mr. Lofay and Mr. Manzi, made the decision to terminate plaintiff's employment. (Ex. 2 at ¶ 15) (Ex. 6 at ¶ 8). Once the decision was made to discharge plaintiff, Ms. Boeckstiegel notified Security, which reprinted stop orders at all security gates, increased security patrols, and notified the St. Louis County Police Department, the Security Manager, and the Plant Manager. (Ex. 2 at ¶ 16) (Ex. 2E at D002371).

On June 22, 2005, plaintiff's employment with DaimlerChrysler was terminated. (Ex. 1 at 69:9-12 & 192:13-15) (Ex. 2 at ¶ 16) (Ex. 4F at D000007). Plaintiff had been out from work from the time of his sick leave, April 1, 2005, through his termination. (Ex. 1 at 69:13-24) (Ex. 4F at D000007). By letter dated June 22, 2005, plaintiff was notified of his termination due to a violation of the Standards of Conduct by "threatening, intimidating, coercing, harassing, retaliating or using abusive language to others." (Ex. 1 at 200:16-201:13) (Ex. 2F, letter). Plaintiff was also mailed a Supervisor's Report indicating that he was being discharged due to the seriousness of the violation of the Standards of Conduct because during a DEP examination he made death threats against members of management and an hourly employee of DaimlerChrysler. (Ex. 1 at 201:20-202:8) (Ex. 2G, Supervisor's Report).

Plaintiff alleges that DaimlerChrysler committed the state law tort of defamation. (Pl.'s Compl. at ¶¶ 31-38). Plaintiff claims that DaimlerChrysler made false statements to the Missouri Division of Employment Security in protest of his claim for unemployment compensation. (Pl.'s Compl. at ¶¶ 15 & 32). The protest of plaintiff's unemployment compensation claim was made by

Leon Boyce. (Ex. 1 at 303:19-304:3). Plaintiff also claims that DaimlerChrysler made false statements to his coworkers and acquaintances. (Pl.'s Compl. at ¶ 32).

The false statement that Plaintiff claims was made to his co-workers occurred when Angela Miller discharged him from employment in the presence of Lee Lansdon. Plaintiff alleges that Ms. Miller falsely accused him of making false and misleading statements to the corporation by receiving SUB-pay and unemployment benefits while he was working at the South Plant. (Pl.'s Decl. at 2, ¶ 11) (Ex. 1 at 305:22-306:13). There are no other alleged statements that plaintiff claims are defamatory. (Ex. 1 at 305:23-306:13).

Plaintiff also brings a claim for intentional infliction of emotional distress. (Pl.'s Compl. at ¶¶ 39-45). Plaintiff claims that DaimlerChrysler intentionally inflicted emotional distress upon him by violating his federally protected rights and by disseminating defamatory statements about him. (Pl.'s Compl. at ¶ 40). Plaintiff claims that the emotional distress he sustained "was severe and of a nature that no reasonable person could be expected to endure." (Pl.'s Compl. at ¶ 43). Plaintiff claims that he has suffered "headaches, stress, shame, defeat, embarrassment, and humiliation." (Pl.'s Compl. at ¶ 45).

Plaintiff also alleges a claim of negligent infliction of emotional distress. (Pl.'s Compl. at ¶¶ 46-54). Plaintiff claims that DaimlerChrysler "had a continuing and affirmative duty to perform professional duties in such a manner as not to inflict emotional distress on Plaintiff." (Pl.'s Compl. at ¶ 47). Plaintiff also claims that he has suffered "headaches, stress, shame, defeat, embarrassment, and humiliation." (Pl.'s Compl. at ¶ 54).

On November 8, 2005, plaintiff's complaint was docketed by the Clerk of the Court.  Plaintiff contends that he submitted the complaint to the Court on November 6, 2005, but mistakenly forgot to include the filing fee, and that the Clerk did not file the complaint until the fee was paid.

## IV.  <u>Discussion</u>.

Defendant DaimlerChrysler has raised a number of procedural arguments concerning the timeliness and exhaustion of plaintiff's Title VII race discrimination claims.  These arguments, however, do not affect plaintiff's § 1981 claims, as the statutes are not co-extensive.  <u>See</u> <u>Kim v. Nash Finch Co.</u>, 123 F.3d 1046, 1063 (8th Cir. 1997).  A race discrimination claim under 42 U.S.C. § 1981 is not subject to Title VII's 90-day limitation period or to exhaustion requirements.  <u>Id.</u>; <u>Johnson v. Railway Express Agency, Inc.</u>, 421 U.S. 454, 462 (1975).

In Count II of the complaint, plaintiff alleges that defendant violated § 1981 by (1) terminating plaintiff's employment in November 2004 for erroneously receiving excess unemployment payments, while not terminating Caucasian employees who received excess unemployment payments; (2) terminating plaintiff's employment in June 2005 for seeking psychological treatment while not terminating Caucasian employees who sought similar treatment; and (3) terminating plaintiff's employment in June 2005 for making statements to his physician while not terminating Caucasian employees who made similar statements.  <u>See</u> complaint, ¶ 28 (incorporating prior paragraphs of the complaint).

Thus, plaintiff asserts disparate treatment based on race.  The elements of a § 1981 disparate treatment claim and a Title VII disparate treatment claim are identical.  <u>Kim v. Nash Finch Co.</u>, 123 F.3d 1046, 1063 (8th Cir. 1997).  To establish a prima facie case of disparate treatment based on race discrimination, a plaintiff must prove that: (1) he is a member of a protected class; (2) he was qualified

to perform his duties; (3) he suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination, which may include that similarly situated employees, who are not members of the protected group, were treated differently. <u>Green v. Franklin Nat'l Bank of Minneapolis</u>, 459 F.3d 903, 913 (8th Cir. 2006); <u>Rodgers v. U.S. Bank, N.A.</u>, 417 F.3d 845, 850 (8th Cir. 2005).

Plaintiff's § 1981 discrimination claims are subject to the burden-shifting analysis developed in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993). <u>See</u> <u>Hughes v. Ortho Pharm. Corp.</u>, 177 F.3d 701, 704 (8th Cir.1999). Under the burden-shifting analysis, plaintiff must first establish a prima facie case of intentional discrimination. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Bashara v. Black Hills Corp.</u>, 26 F.3d 820, 823 (8th Cir.1994). If he does so, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802. If defendant articulates such a reason, plaintiff must then demonstrate that defendant's reason is a pretext for discrimination. <u>Id.</u> The applicable standard in the Eighth Circuit on summary judgment "require[s] only that plaintiff adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove defendant's articulated reasons for its actions." <u>Davenport v. Riverview Gardens Sch. Dist.</u>, 30 F.3d 940, 945 n.8 (8th Cir. 1994). <u>See</u> <u>Strate v. Midwest Bankcentre, Inc.</u>, 398 F.3d 1011, 1021 (8th Cir. 2005).

Plaintiff may either prove pretext directly, by showing that defendant was more likely motivated by a discriminatory reason, or indirectly, by showing that defendant's explanation is unworthy of credence. <u>See</u> <u>Rose-Maston v. NME Hospitals, Inc.</u>, 133 F.3d 1104, 1108 (8th Cir. 1998). Plaintiff at all times bears the ultimate burden of establishing the existence of facts which, if

proven at trial, would permit a jury to conclude that intentional discrimination was the true reason for defendant's action.  See St. Mary's Honor Ctr., 509 U.S. at 507-08.

**A.  November 2004 Discharge**.

Defendant moves for summary judgment on plaintiff's claims concerning his November 2004 discharge, asserting that plaintiff cannot establish a prima facie case of racial discrimination because he cannot show that the discharge occurred under circumstances which give rise to an inference of unlawful discrimination.

Defendant asserts that plaintiff admits the November 2004 discharge did not occur because of his race.  Specifically, defendant states that plaintiff testified the reason he was terminated was "the whole unemployment SUB-pay issue and they basically felt that I was frauding [sic] the company out of money," Pl.'s Dep. at 180, and that the initial discharge "was just a wrongful termination."  Id. at 185.  Plaintiff also testified that no DaimlerChrysler official made any racially  disparaging comments to him or indicated in any manner that his termination was based on his race.  Id. at 191, 257.  Plaintiff testified that he did not make any complaints to DaimlerChrysler about being discriminated again.  Id. at 244-47.  Plaintiff also testified that he thinks DaimlerChrysler officials actually believed that he had committed the acts he was terminated for and were not simply making up an excuse to fire him.  See Pl.'s Dep. at 180.

Plaintiff responds that although he initially believed that he was terminated in connection with false allegations that he received extra SUB-pay, when he returned to work in March 2005 he realized that his termination was based at least in part on his race.  Id. at 180-81.  Plaintiff argues that DaimlerChrysler employees assumed that he stole from the company because they had recently caught two other African-American employees receiving unemployment and SUB-pay while on sick leave,

and wrongfully associated plaintiff's innocent actions with the wrongful actions of other employees simply because they were all African-American.

Plaintiff also contends that DaimlerChrysler is misstating the facts and drawing faulty conclusions with respect to his filing of claims for unemployment insurance. Plaintiff asserts that he did not file claims for weeks when he was working at the South Plant, but rather filed claims for weeks that he was unemployed but had not yet received SUB-pay. Plaintiff also asserts that because he filed claims for unemployment with the Missouri Division of Employment Security, and not DaimlerChrysler, defendant cannot claim that he provided it with faulty information. Finally, plaintiff contends that DaimlerChrysler only learned that he received extra unemployment because of plaintiff's actions in bringing to defendant's attention a letter from the Division of Employment Security, which stated that plaintiff had repaid the excess payments.

Defendant replies that plaintiff's entire basis for asserting that the November 2004 discharge was racially motivated is his own speculation and conclusions, as plaintiff has submitted no evidence to demonstrate an inference of unlawful discrimination. Defendant states that plaintiff's assertion that DaimlerChrysler employees assumed he stole from the company because they had recently caught two other African-American employees receiving unemployment and SUB-pay while on sick leave is entirely without evidentiary support in the record.

Defendant also states that it is undisputed plaintiff applied for unemployment benefits for the weeks ending September 18, 2004, September 25, 2004 and October 2, 2004, when he was working, see Pl.'s Statement of Uncontroverted Facts at 1, ¶ 1, and that plaintiff received unemployment compensation payments from the Division that he was not eligible to receive. Id. at ¶ 2. Defendant states that it notified the Division that plaintiff applied for and received unemployment benefits for the

weeks ending September 18, September 25 and October 2, 2004, even though he was actually in the South Plant working. See Pl.'s Response to Def.'s Statement of Uncontroverted Material Facts, ¶ 61. Defendant then notified plaintiff that he was being discharged due to a violation of DaimlerChrysler's Standards of Conduct, for providing false and/or misleading information to DaimlerChrysler, as defendant considers claims for unemployment compensation for weeks in which an employee is working as providing false information to the corporation. See Hatfield Decl. at 2-3, ¶¶ 10-11.

The Court finds that plaintiff cannot establish a prima facie case of disparate treatment based on race with respect to his November 2004 discharge, because he cannot establish that the circumstances of his discharge give rise to an inference of discrimination. See Green, 459 F.3d at 913. Plaintiff has failed to present any facts, as opposed to his own unsubstantiated and conclusory statements, to raise a genuine issue of material fact with respect to an inference of discrimination. Unsubstantiated and conclusory allegations are not sufficient to support an inference of discrimination, and "[c]onclusory affidavits, standing alone, cannot create a genuine issue of material fact precluding summary judgment." Rose-Maston v. NME Hospitals, Inc., 133 F.3d 1104, 1109 (8th Cir. 1998); see Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004).

In this case, plaintiff's Declaration states in relevant part that after he returned to work, coworkers told him that two other African-Americans were terminated for receiving unemployment and SUB-pay while on sick leave. Plaintiff avers, "After learning this, I realized DaimlerChrysler assumed that I was involved in a similar scheme based on my race." Pl.'s Decl. at 3, ¶ 19. Plaintiff's subjective realization is not evidence. Plaintiff has also failed to present any evidence to support his claim as pleaded, because he had not offered any evidence to support the assertion that similarly

situated Caucasian employees who improperly claimed unemployment benefits for weeks during which they were working were not discharged.

"A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor." Bass v. SBC Commc'ns, Inc., 418 F.3d 870, 872-73 (8th Cir. 2005) (citing Wilson v. International Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995). Plaintiff does not have sufficient probative evidence that would permit a finding in his favor with respect to an illegal termination based on race in November 2004.

Plaintiff's attempt to reargue the correctness of DaimlerChrysler's decision to terminate him in November 2004 does not raise an issue of material fact sufficient to preclude summary judgment. Although plaintiff admits in his Declaration that he sought unemployment benefits for three weeks that he was working, plaintiff also denies the facts upon which his discharge was based. Putting aside plaintiff's admission, his mere denial of the facts surrounding his discharge, standing alone, is not evidence that raises an inference of discrimination or serves to establish that defendant's stated reason for the discharge was a pretext for illegal discrimination. See Stuart v. General Motors Corp., 217 F.3d 621, 636 (8th Cir. 2000). The relevant inquiry is whether DaimlerChrysler believed that plaintiff was guilty of conduct which justified his discharge in November 2004. See Scroggins v. Univ. of Minn., 221 F.3d 1042, 1045 (8th Cir. 2000). Even if DaimlerChrysler was completely mistaken in its belief that plaintiff improperly sought unemployment benefits or SUB-pay while working at the South Plant, any such mistake would not automatically prove that it was instead motivated by unlawful discrimination. See Johnson v. AT & T Corp., 422 F.3d 756, 762-63 (8th Cir. 2005). Plaintiff has not provided any facts which serve to call into question DaimlerChrysler's motive in discharging him.

For these reasons, defendant's motion for summary judgment on plaintiff's § 1981 claim based on the November 2004 discharge in Count II should be granted. Because the analysis of plaintiff's Title VII claim based on the November 2004 discharge is the same as the § 1981 analysis, see Kim v. Nash Finch Co., 123 F.3d at 1063, defendant's motion for summary judgment on Count I should also be granted with respect to the November 2004 discharge, and the Court need not address defendant's arguments concerning the asserted procedural deficiencies relating to plaintiff's Title VII claim.

**B. June 2005 Discharge.**

Defendant also moves for summary judgment on plaintiff's claims concerning his second discharge in June 2005, asserting that plaintiff cannot establish a prima facie case of racial discrimination because he cannot show that the discharge occurred under circumstances which give rise to an inference of unlawful discrimination.

Defendant asserts that plaintiff admits the June 2005 discharge was not based on his race. Specifically, defendant states that plaintiff testified he didn't have any reason to think the second discharge was race based, Pl.'s Dep. at 125-27, and that the second discharge was not based on his race at all. Pl.'s Dep. at 192-95. In response to the question, "Now, do you think that your second termination was on the basis of your race at all?" plaintiff stated, "No. . . . Not necessarily. I just think, like I said, it just reflected an ongoing problem I was having with them." Id. at 194-95. Instead, defendant states that plaintiff testified he believes the second discharge was due to a disability and retaliation. Id. at 126-27; 192-93.

Defendant also contends that even if plaintiff can establish a prima facie case, it is entitled to summary judgment because plaintiff cannot establish that its legitimate, nondiscriminatory reason for discharging plaintiff is a pretext for illegal race discrimination. Specifically, defendant states that it

discharged plaintiff in June 2005 because he made death threats against DaimlerChrysler employees. Defendant states that plaintiff went on sick leave to receive psychological treatment, and in April 2005 was referred to a psychiatrist, Dr. Gaskin, to determine if plaintiff would continue to qualify for sickness and accident benefits, or if he was capable of returning to work. During the psychiatric examination, plaintiff stated, "I still want to murder Leon Boyce, that's the guy who had me terminated for no f...ing reason." Pl.'s Response to Def.'s Statement of Facts, ¶ 97. During a subsequent psychiatric examination in May 2005, plaintiff discussed his thoughts of harming other DaimlerChrysler employees, including "putting a bullet [in] Leon Boyce's head and if I can find Karen Boeckstiegel, Don Pizzo got it coming, but the only person I want is Leon Boyce." Id., ¶ 102. When asked if he thought he could return to work with those thoughts, plaintiff stated, "I can't wait to go back to work, I want to see them bitches." Id., ¶ 103. When asked about the possibility of not being able to return to work at DaimlerChrysler, plaintiff stated, "I can find another job, Leon Boyce has got to die." Id., ¶ 104. Plaintiff knew that neither examination was confidential and that no physician-patient relationship was established. Id., ¶¶ 95-96, 101. The psychiatrist told plaintiff that he had a duty to notify the threatened individuals about plaintiff's threats. Id., ¶ 105. Plaintiff testified in his deposition that he had expressed to Dr. Gaskin thoughts of "straight hurting" Boyce, Boeckstiegel and Pizzo, Pl.'s Dep. at 202, and that his expression of wanting to hurt those individuals "probably did" include wanting to kill them. Id. at 203.

Defendant states that after its Security Office, plant manager, human resources manager and the threatened individuals were notified of plaintiff's statements to the psychiatrist, plaintiff's employee badge was disabled and a stop order was posted so that he could not enter the South Plant. Defendant offered to give the threatened employees escorts to their vehicles and advised them to change their

parking habits for a while, and reported plaintiff's threats to the St. Louis County Police Department. Defendant's South Plant officials discussed the matter with corporate human relations and union relations officials, and decided to discharge plaintiff. Defendant states that its decision to discharge plaintiff was informed in part by the January 2005 shooting by an employee at defendant's Toledo, Ohio plant.

Plaintiff responds that defendant's stated legitimate nondiscriminatory reason for discharging him in June 2005 is merely a pretext for illegal race discrimination. Plaintiff states that his complaint alleges that he was discharged for seeking psychological treatment, although Caucasian employees who sought psychological treatment were not discharged, and for making statements to his physician although Caucasian employees who made similar statements were not terminated. Plaintiff admits that "made comments to Dr. Gaskin that he had thoughts about hurting several employees at work, but simple comments do not amount to threats." Pl.'s Response to Def.'s Mot. for Summ. J. at 8. Plaintiff states that he knew Dr. Gaskin would report to DaimlerChrysler, and asserts that it "is not realistic to assume that the Plaintiff would make the alleged comments with the intent that they be taken as threats, nor is it realistic that they be received as threats." Id. Plaintiff states in his Declaration, "Dr. Gaskin told me that if I told him that I seriously intended to inflict bodily harm upon someone, then he would need to admit me to into a psychiatric ward." Pl.'s Decl. at 3, ¶ 21.

Defendant replies that plaintiff presents no evidence demonstrating an inference of unlawful discrimination, and attempts to rest solely on allegations contained in the complaint without record support for those allegations. Defendant reiterates plaintiff's deposition testimony admitting that his second discharge was not based on his race. Defendant further replies that plaintiff admits making death threats against three DaimlerChrysler employees, and the undisputed evidence shows that it took

the threats seriously and discharged plaintiff because of them. Defendant asserts that it has an absolute interest in employee safety and the law does not require it to wait and see if plaintiff was serious about the threats before discharging him, citing Collins v. Blue Cross Blue Shield of Michigan, 579 N.W.2d 435, 437 (Mich. Ct. App. 1998).

The Court finds that plaintiff cannot establish a prima facie case of disparate treatment based on race with respect to his June 2005 discharge, because he cannot establish that the circumstances of his discharge give rise to an inference of discrimination. See Green, 459 F.3d at 913. Plaintiff has failed to present any facts, as opposed to his own unsubstantiated and conclusory statements, to raise a genuine issue of material fact with respect to an inference of discrimination. Plaintiff presents no evidence of white DaimlerChrysler employees who were similarly situated, i.e., that they admittedly made death threats against DaimlerChrysler supervisors and other employees at the South Plant, and were treated differently. Plaintiff's unsubstantiated and conclusory allegations are not sufficient to support an inference of discrimination, and "[c]onclusory affidavits, standing alone, cannot create a genuine issue of material fact precluding summary judgment." Rose-Maston, 133 F.3d at 1109; see Henthorn, 359 F.3d at 1026.

At the summary judgment stage, plaintiff may not rely on the allegations of his complaint to avoid summary judgment. Rule 56(e), Fed. R. Civ. P.; Herring, 207 F.3d at 1029. "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor." Bass, 418 F.3d at 872-73 (citing Wilson v. International Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995)). Plaintiff does not have sufficient probative evidence that would permit a finding in his favor with respect to an illegal termination based on race in June 2005.

Moreover, assuming arguendo that plaintiff could establish a prima facie case, plaintiff has failed to present any evidence which tends to establish that DaimlerChrysler's articulated legitimate, nondiscriminatory reason for his discharge in June 2005 was a pretext for illegal discrimination. Plaintiff admits that he made statements to defendant's psychiatrist to the effect that he wished to kill or otherwise cause bodily harm to three DaimlerChrysler employees. Threats of workplace violence are without doubt a legitimate basis for termination. See, e.g., Johnson, 422 F.3d at 762 (discharge of employee accused of making bomb threats was legitimate); Clark v. Runyon, 218 F.3d 915, 919 (8th Cir. 2000) ("Both actual violence against fellow employees and threats of violence are legitimate reasons for terminating an employee"); Blanton v. Prestolite Wire Corp., 208 F.3d 217, 2000 WL 227979 (8th Cir. Feb. 29, 2000) (Table) (unpublished per curiam) (affirming summary judgment for employer in Americans with Disabilities Act case, where former employee threatened to "take out" certain co-employees who had allegedly wronged him, threatened to "blow away" the building housing his employer's workers' compensation carrier, brandished a handgun and threatened suicide during an appointment with his workers' compensation physician, and admitted to threatening a co-employee in a workplace dispute).

For these reasons, defendant's motion for summary judgment on plaintiff's § 1981 claim based on the June 2005 discharge in Count II should be granted. Because the analysis of plaintiff's Title VII claim based on the June 2005 discharge is the same as the § 1981 analysis, see Kim v. Nash Finch Co., 123 F.3d at 1063, defendant's motion for summary judgment on Count I with respect to the June 2005 discharge should also be granted, and the Court does not address defendant's arguments concerning procedural deficiencies relating to plaintiff's Title VII claim.

**C. Plaintiff's State Law Claims**.

Defendant also moves for dismissal of plaintiff's supplemental state law claims for defamation (Count III), intentional infliction of emotional distress (Count IV), and negligent infliction of emotional distress (Count V), asserting that plaintiff fails to state a claim upon which relief can be granted under any of these theories. Plaintiff opposes the dismissal of these claims.[4]

    1. Defamation.

In Count III of the complaint, plaintiff asserts that DaimlerChrysler defamed him by knowingly making false statements to the Division of Employment Security in protest of his claim for unemployment benefits and by making false statements to plaintiff's co-workers. The complaint does not describe the allegedly false statements, but this claim arises from the November 2004 discharge.

The elements of the tort of defamation in Missouri require: (1) publication, (2) of a defamatory statement, (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite degree of fault, and (6) that damages the plaintiff's reputation. Overcast v. Billings Mut. Ins. Co., 11 S.W.3d 62, 70 (Mo. 2000) (en banc).

    a. Statements to Missouri Division of Employment Security

Plaintiff's first allegation of defamation stems from statements that were sent to the Division by DaimlerChrysler's Employment Supervisor, Leon Boyce, in protest of plaintiff's claims for

---

[4]"[W]hen state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law, as a matter of comity." American Civil Liberties Union v. City of Florissant, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (internal punctuation and quoted case omitted). Where discovery is completed and the case is ready for trial, however, a court does not abuse its discretion in addressing issues of state law on which there is little basis for dispute. Birchem v. Knights of Columbus, 116 F.3d 310, 314 (8th Cir. 1997). Further, although plaintiff did not plead the existence of diversity jurisdiction, the Court finds that diversity jurisdiction may exist over the complaint as the parties appear to be of diverse citizenship and plaintiff prayed for punitive damages in the amount of $500,000.

unemployment compensation. Defendant moves for dismissal of this allegation on the basis that plaintiff cannot establish the requisite element of publication, because the statements are absolutely privileged. See Mo. Rev. Stat. § 288.250 (2000) (proceedings before the Division are confidential and information provided to the Division in protest of a claim for unemployment compensation cannot be used as a basis for a defamation claim). Applying this statute, Missouri courts have held that statements made to the Division in protest of a claim for unemployment benefits are absolutely privileged. See Remington v. Wal-Mart Stores, Inc., 817 S.W.2d 571, 574-75 (Mo. Ct. App. 1991). Because statements made to the Division are absolutely privileged, they are not considered "published" for purposes of defamation. See Washington v. Thomas, 778 S.W.2d 792, 796 (Mo. Ct. App. 1989). Defendant is therefore entitled to dismissal of this aspect of plaintiff's defamation claim.

### b. Statements to Plaintiff in the Presence of Lee Lansdon

Plaintiff's second allegation of defamation is based on statements made by DaimlerChrysler employee Angela Miller in discharging plaintiff in the presence of Lee Lansdon. The alleged defamatory statement at issue is that Miller falsely stated plaintiff made false and misleading statements to the corporation by wrongly receiving SUB-pay, and not just wrongly receiving unemployment compensation, while he was working at the South Plant.[5] Plaintiff contends this statement is false and defamatory because it accuses him of receiving SUB-pay in addition to unemployment benefits while working. Plaintiff asserts that the statement was false because an employee cannot receive SUB-pay unless he is on a qualified layoff. See Sec. III, Facts, supra at 7.

---

[5]As stated above in the Facts section, the SUB-pay benefit payable to an eligible employee for any week is an amount which, when added to the employee's state benefit (i.e., unemployment compensation) or other compensation received, will equal approximately 95% of an employee's weekly after-tax pay, minus $30.00 to take into account work-related expenses not incurred during layoff. (Ex. 1 at 115:9-117:19) (Ex. 5 at ¶ 5) (Ex. 5A at D000711).

Defendant moves for dismissal of this allegation on the grounds that plaintiff cannot establish publication or falsity. Because the Court concludes as a matter of law that plaintiff cannot establish falsity, it will grant defendant's motion to dismiss this allegation and does not reach the issue of publication.

It is a defamation plaintiff's burden to prove that any alleged defamatory statements are false. Overcast, 11 S.W.3d at 71. Plaintiff's allegation of falsity does not go to the substance of the accusation that he provided misleading information to DaimlerChrysler by claiming benefits to which he was not entitled, rather, the allegation is that DaimlerChrysler accused plaintiff of claiming two kinds of unwarranted benefits rather than one.

Truth is a complete defense to a charge of defamation. Rice v. Hodapp, 919 S.W.2d 240, 243 (Mo. 1996) (en banc). It is well established that the law of defamation "overlooks minor inaccuracies and concentrates upon substantial truth." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-17 (1991). Missouri law recognizes the defense of substantial truth. "Slight inaccuracies of expression are immaterial if the defamatory charge is true in substance." Moore v. Credit Information Corp. of America, 673 F.2d 208, 210 (8th Cir. 1982) (quoting Kleinschmidt v. Johnson, 183 S.W.2d 82, 86 (Mo. 1944)). To defend on the basis of truth, it is not necessary that the precise facts stated in the allegedly defamatory communication be found to be literally true. Brown v. Briggs, 569 S.W.2d 760, 762 (Mo. Ct. App. 1978). The Supreme Court has stated that the applicable test is whether the alleged defamation, as published, would have a different effect on the mind of the audience than that which would result from the literal truth. Masson, 501 U.S. at 517.

In this case, it is undisputed that plaintiff applied for and received unemployment compensation from the Division of Employment Security for five weeks, when he was only entitled to such

compensation for two weeks. Plaintiff applied for unemployment compensation for the weeks ending September 18, 2004, September 25, 2004 and October 2, 2004, when he was working in the South Plant. DaimlerChrysler notified the Division that plaintiff had applied for and received benefits for those weeks even though he was actually in the South Plant working. Plaintiff was notified that he was being discharged for a violation of DaimlerChrysler's Standards of Conduct for providing false and/or misleading information to the corporation. The underlying conduct that violated defendant's Standards was plaintiff's false unemployment benefit claims.

In this case, applying the <u>Masson</u> standard, it is clear that the alleged defamation, as published, would not have a different effect on the mind of the audience than the effect which would result from the literal truth. The gist of DaimlerChrysler's allegedly defamatory statement is that plaintiff falsely claimed entitlement to benefits while he was working. An unemployment compensation claim by a DaimlerChrysler seniority employee such as plaintiff automatically generates a coordinating claim for SUB-pay. By falsely claiming unemployment benefits, plaintiff also falsely claimed SUB-pay benefits.[6] Whether or not plaintiff received SUB-pay benefits for weeks that he was actually at work, when he claimed unemployment benefits for those weeks, a SUB-pay report was generated which included plaintiff's name.

---

[6]As discussed <u>supra</u> in the Facts section, a DaimlerChrysler seniority employee can make a claim for unemployment compensation with the State through an automated system, for any week during which the employee was on layoff. The State then electronically transmits to DaimlerChrysler a weekly register of all employees who have received unemployment compensation for the week; the electronic register is entered into DaimlerChrysler's computer system and a SUB-pay report is generated; and if the employee is on a qualifying layoff, he or she will automatically receive SUB-pay for the week claimed. If an employee is not on a qualifying layoff, he or she will automatically be denied SUB-pay. (Def.'s Ex. 5 at ¶ 7).

The allegedly defamatory statements would not have had a different effect on the audience if the information concerning SUB-pay had been omitted, and therefore are not actionable. The statements made by Ms. Miller surrounding plaintiff's discharge were true in substance. Defendant's motion to dismiss this aspect of plaintiff's defamation claim should therefore be granted.

2. <u>Intentional Infliction of Emotional Distress</u>.

In Count IV of the complaint, plaintiff asserts that DaimlerChrysler intentionally inflicted emotional distress upon him by "violating his Federally protected rights and by disseminating defamatory statements about the Plaintiff." (Complaint at 6, ¶ 40).

The elements of the tort of intentional infliction of emotional distress in Missouri are that (1) the defendant's conduct was extreme and outrageous; (2) the defendant acted in an intentional or reckless manner; and (3) the defendant's conduct caused severe emotional distress that resulted in bodily harm. <u>Nazeri v. Missouri Valley College</u>, 860 S.W.2d 303, 316 (Mo. 1993) (en banc). Liability has been found only where the conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." <u>Warrem v. Parrish</u>, 436 S.W.2d 670, 673 (Mo. 1969). In addition, the "conduct must be intended only to cause extreme emotional distress to the victim." <u>Gibson v. Brewer</u>, 952 S.W.2d 239, 259 (Mo. 1997) (en banc) (quoting <u>K.G. v. R.T.R.</u>, 918 S.W.2d 795, 799 (Mo. 1996) (en banc)). To meet the third element, it is necessary to plead that the emotional distress is medically diagnosable and medically significant. <u>Childs v. Williams</u>, 825 S.W.2d 4, 10 (Mo. Ct. App. 1992); <u>see</u> <u>also</u> <u>Collins v. Burg</u>, 169 F.3d 563, 565-66 (8th Cir. 1999).

Defendant moves for dismissal of this claim on the grounds that plaintiff's allegations indicate that DaimlerChrysler's alleged conduct was not intended solely to cause extreme emotional distress,

and plaintiff has failed to plead that the alleged emotional distress was medically diagnosable and medically significant.

A claim for intentional infliction of emotional distress will not lie when the alleged conduct is intended to invade other legally protected interests of the plaintiff. See K.G., 918 S.W.2d at 799 (citing Restatement (Second) of Torts, § 47). It is clear from the face of the complaint that plaintiff's claim of intentional infliction of emotional distress relies on precisely the same conduct that he elsewhere contends is discriminatory or defamatory.

To the extent plaintiff's intentional infliction of emotional distress claim is based on defendant's violation of his federal rights against race discrimination in employment, the claim must fail because plaintiff has alleged that defendant intended to discriminate against him on the basis of race, thus invading his legally protected interests under Title VII and 42 U.S.C. § 1981. Plaintiff therefore cannot establish that defendant's conduct in violating his federally protected rights was intended solely to cause plaintiff emotional distress.[7]

This claim also fails to the extent it is based on alleged defamation, because under Missouri law, the tort of intentional infliction of emotional distress "does not lie when the offending conduct consists only of a defamation." Nazeri, 860 S.W.2d at 316. The rationale for this rule is that damages for mental suffering are recoverable in a defamation action and, as a result, "any recovery for emotional distress as an independent tort would duplicate part of the recovery for a [defamation] claim

---

[7]Moreover, because the Court has previously determined as a matter of law that defendant did not discriminate against plaintiff on the basis of race, plaintiff's claim for intentional infliction of emotional distress based on the violation of his federally protected rights must necessarily fail. See Gordon v. City of Kansas City, Mo., 241 F.3d 997, 1004-05 (8th Cir. 2001). This is because plaintiff could not establish that DaimlerChrysler engaged in "extreme and outrageous conduct which intentionally or recklessly caused severe emotional distress." Id. (quoting Gibson v. Brewer, 952 S.W.2d 239, 248-49 (Mo. 1983) (en banc)).

arising out of the same conduct." Id. (citation omitted). Further, as noted in footnote 6, this claim also fails because the Court has determined as a matter of law that defendant did not defame plaintiff, and therefore plaintiff cannot establish that defendant acted outrageously by defaming him. See Gordon, 241 F.3d at 1004-05.

Plaintiff's intentional infliction of emotional distress claim also fails because plaintiff has failed to allege that he suffered severe emotional distress by pleading that the emotional distress is "medically diagnosable and medically significant." See Dunham v. City of O'Fallon, Mo., 945 F. Supp. 1256, 1262-63 (E.D. Mo. 1996) (applying Missouri law) (quoting Hendrix v. Wainwright Indus., 755 S.W.2d 411, 412 (Mo. Ct. App. 1990)). Plaintiff has pleaded that the "emotional distress sustained by the Plaintiff was severe and of a nature that no reasonable person could be expected to endure." (Complaint at 7, ¶ 43). Plaintiff has not pleaded that the alleged emotional distress is medically diagnosable and medically significant. As a result, plaintiff has failed to state a claim for intentional infliction of emotional distress.

For these reasons, defendant's motion to dismiss plaintiff's claim for intentional infliction of emotional distress should be granted.

### 3. Negligent Infliction of Emotional Distress.

In Count V of the complaint, plaintiff alleges that DaimlerChrysler negligently inflicted emotional distress upon him. "The tort of negligent infliction of emotional distress is a negligence action. The general elements of a negligence action are 1) a legal duty of the defendant to protect the plaintiff from injury, 2) breach of the duty, 3) proximate cause, and 4) injury to the plaintiff." Thornburg v. Federal Express Corp., 62 S.W.3d 421, 427 (Mo. Ct. App. 2001) (citation omitted). "Claims seeking recovery of damages for the negligent infliction of emotional distress require proof

of two additional elements: 1) that the defendant should have realized that his conduct involved an unreasonable risk of causing distress, and 2) that the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant." Id.

Defendant moves for dismissal of this claim on the grounds that (1) plaintiff has not alleged that DaimlerChrysler breached a legally recognized duty owed to him, and (2) plaintiff failed to plead that the alleged emotional distress was medically diagnosable and medically significant.

Plaintiff alleges that DaimlerChrysler "had a continuing affirmative duty to perform professional duties in such a manner as not to inflict emotional distress on Plaintiff." (Complaint at 7, ¶ 47). This allegation merely posits that DaimlerChrysler had a duty not to negligently inflict emotional distress upon plaintiff, which is not a legally recognized duty. Plaintiff therefore fails to state a claim upon which relief can be granted for the negligent infliction of emotional distress.

Plaintiff alleges that he suffered "mental injuries" as a result of DaimlerChrysler's breach of duty, and suffered "mental conditions including but not limited to headaches, stress, shame, defeat, embarrassment, and humiliation." (Complaint at 8, ¶ 54). Plaintiff fails to plead the required elements that his alleged emotional distress was medically diagnosable and of sufficient severity to be medically significant. See Hendrix, 755 S.W.2d at 412. "The type of harm necessary to establish a threshold tort in Missouri 'excludes mere upset, dismay, humiliation, grief, and anger.'" Hardge-Harris v. Pleban, 741 F. Supp. 764, 777 (E.D. Mo. 1990) (quoting Bass v. Nooney Co., 646 S.W.2d 765, 772-73 (Mo. 1983) (en banc)) (dismissing claim for negligent infliction of emotional distress where alleged distress was "emotional distress, embarrassment, public ridicule, scorn and trauma"), aff'd, 938 F.2d 185 (8th Cir. 1991) (Table) (unpublished per curiam).

As a result, plaintiff's claim for negligent intention of emotional distress fails to state a claim upon which relief can be granted, and defendant's motion to dismiss the claim should be granted.

**V.  Conclusion**.

For the foregoing reasons, the Court concludes that plaintiff has failed to establish a prima facie case of race discrimination in violation of either Title VII or 42 U.S.C. § 1981, and that defendant's motion for summary judgment should therefore be granted as to all claims in Counts I and II.  The Court further concludes that defendant is entitled to dismissal of plaintiff's supplemental state law claims for defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress, for failure to state a claim upon which relief can be granted.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Daimler Chrysler Corporation's Motion for Summary Judgment is **GRANTED** in all respects.  [Doc. 17]

An appropriate judgment and order of dismissal will accompany this memorandum and order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this  _14th_  day of June, 2007.